UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. JOSEPH MERCOLA, DO,<br><br>                                    Plaintiff,<br><br>                    - against -<br><br>VIJI VARGHESE,<br><br>                                    Defendant. | **VERIFIED COMPLAINT**<br><br>**Case No. _____**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Dr. Joseph Mercola, DO ("Dr. Mercola" or "Plaintiff"), by and through undersigned counsel, respectfully files this complaint against Viji "VJ" Varghese ("Defendant" or "Varghese"). Plaintiff alleges as follows:

<u>**NATURE OF THE CASE**</u>

1.      This is a civil action arising out of a fraudulent scheme perpetrated by Defendant Varghese to defraud Plaintiff Dr. Mercola of approximately $14 million in cryptocurrency assets.

2.      Defendant marketed himself as legitimate financial insider and adviser and encouraged Plaintiff to allow Defendant to manage the investment of Plaintiff's digital assets in return for a fee.

3.      Defendant's representations about his finance experience were false, designed to induce Plaintiff's trust for the purpose of misappropriating funds.

4.      In reliance on these misrepresentations, Plaintiff transferred a substantial amount of assets to Defendant's control, which were then misappropriated, laundered through multiple cryptocurrency exchanges, and made otherwise unrecoverable to Dr. Mercola.

5.      Plaintiff brings this action to recover his asserts and related damages, and to obtain equitable relief, including but not limited to, temporary and preliminary injunctive relief to prevent

1

further harm during the course of this litigation and to preserve the availability of effective final remedies. Such requested relief includes an order freezing Plaintiff's digital assets, including funds held in cryptocurrency wallets and on exchange platforms.

## JURISDICTION AND VENUE

1.      This Court has federal question subject matter jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, § 27 of the Exchange Act (15 U.S.C. § 78aa). In the alternative, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties, and the amount in controversy exceeds $75,000.

2.      This action is a civil action to recover more than $14,348,857 worth of Plaintiff's cryptocurrency in Defendant's unlawful possession. Accordingly, the amount in controversy well exceeds the jurisdictional amount of $75,000 and likely invokes federal law governing securities.

3.      This Court has personal jurisdiction over Plaintiff because this case arises out of his contact with this forum. This Court has personal jurisdiction over Defendant because the Southern District of New York is his home forum.

4.      Venue is appropriate in the United States District Court for the Southern District of New York under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(1), and (c)(3), because the Defendant resides or does business within this jurisdiction, and the events giving rise to the claims occurred in this jurisdiction. Venue is also proper in this Judicial District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa(c)).

## PARTIES

5.      Plaintiff Dr. Joseph Mercola, DO is a board-certified family medicine osteopathic physician.

6.      Plaintiff is a citizen of the State of Florida who resides at 740 John Anderson Dr,

2

Ormond Beach, Florida, 32176.

7.      Defendant Viji Varghese is an individual believed to reside at 5009 John Hancock Ct., New Windsor, New York, 12553. Defendant has engaged in fraudulent business activities under the guise of performing investment management services. Defendant is believed to have control and access over the following cryptocurrency exchange wallet addresses:

   a. **FTX Deposit Wallet:** ████████████████████████

   b. **OKX Deposit Wallet:** ████████████████████████

   c. **FalconX Deposit Wallet:** ████████████████████████

   d. **FortressTrust.com Deposit Wallet:**

      ████████████████████

   e. **Bybit Deposit Wallet:** ████████████████████████

   f. **Kraken Deposit Wallet:** ████████████████████████

## FACTUAL BACKGROUND

8.      Defendant Varghese, previously known as "V the Guerrilla Economist," is the founder and CEO of Royal Amparo DMCC ("Amparo"). Defendant Varghese has a history as an alternative finance commentator, having built his reputation by offering economic predictions and investment advice on platforms like Rogue News, often promoting alternative assets such as gold and cryptocurrency.

9.      Plaintiff met Defendant Varghese in April 2024, after being introduced by a mutual acquaintance—Defendant's business partner, John Singleton. Defendant and Mr. Singleton introduced Defendant as a cryptocurrency expert with worldwide reach and extensive experience regarding all facets of the cryptocurrency marketplace, with various strategies designed to help would-be investors achieve their goals.

10.     Defendant Varghese presented a crypto investment opportunity to Dr. Mercola, in which Defendant offered to manage Plaintiff's Ethereum cryptocurrency assets. Dr. Mercola emphasized that he would want to see results by Fall 2024.

11.     For his services, Defendant would receive 4% of profits.

12.     Defendant Varghese, with Mr. Singleton's aid, held himself out as a seasoned financial professional and insider with privileged access to global markets—particularly in cryptocurrency and precious metals. Defendant represented that he could offer Plaintiff access to proprietary, high-yield investment strategies not available to the general public.

13.     Defendant emphasized a policy of maintaining full transparency with his clients to ensure they have a deep understanding of what is occurring, at all times.

14.     Plaintiff would later learn that Defendant Varghese has a history of misrepresenting his credentials, having made false statements about his alleged background as a former high-level trader and financial insider.

15.     Moreover, Plaintiff has since learned that Defendant Varghese has been accused of fraudulent activities, including running unregistered financial consulting businesses and promoting high-risk investment schemes such as Karatbars International (a goldbased multilevel marketing ("MLM") scheme) and Kryptogenex (a crypto MLM flagged as a possible scam). Plaintiff is unaware of any criminal convictions resulting from these accusations.

**<u>Defendant Induces Dr. Mercola to Participate in a Fraudulent Investment Scheme</u>**

16.     Defendant Varghese's goal was to induce Dr. Mercola to entrust Defendant with "investing" a sizeable portion of Dr. Mercola's substantial cryptocurrency assets. Defendant Varghese stated that such action was a legitimate asset protection and investment management program.

17.    In short, Defendant intended to lie his way into inducing Dr. Mercola into allowing Defendant to Defendant promised secure handling of funds, consistent returns, and strategic deployment into vetted crypto and gold positions.

18.    On or about April 17, 2024, and June 7, 2024, based on these misrepresentations, Defendant induced Plaintiff to invest. In reliance on Defendant's false claims of expertise, safety, and professionalism, Plaintiff transferred approximately 4,553.5 Ethereum ("ETH")—valued at roughly $14 million USD at the time—into the following wallet controlled directly or indirectly by Defendant.:

      a.  **Illicit Actor Wallet:** ████████████████████████

19.    Thereafter, Defendant distributed Plaintiff's 4,553.5 ETH through multiple wallets and cryptocurrency exchanges, including FTX, OKX, FalconX, Bybit, FortressTrust.com, and Kraken.

20.    Defendant also began pressing Dr. Mercola to convert his cryptocurrency into gold to "validate" his system to Dr. Mercola and proposed that Dr. Mercola use a gold warehousing company known as Malca Amit for the conversion.

21.    Dr. Mercola asked an associate of his to perform due diligence on Defendant's proposal, which raised red flags.

22.    Dr. Mercola then retained counsel to perform further due diligence on the conversion.

23.    Dr. Mercola's counsel conducted an on-site audit and discovered that the gold was located in a vault overseas which was held in Defendant's name, not Dr. Mercola's, and that Defendant's representations regarding the conversion were false.

24.    Defendant forged and/or redacted documents to support his misrepresentations

regarding the gold conversion.

25.     Because of the liquidity associated with cryptocurrency and what was quickly revealing itself to be a dishonest relationship, Dr. Mercola demanded that Defendant return his crypto assets to avoid conversion of these assets to another form or account that would be untraceable.

26.     Defendant refused.

27.     Dr. Mercola directed further due diligence on a company Defendant allegedly owned, a Dubai-based company known as Amparo.

28.     This due diligence revealed the Amparo was a shell company with no legitimate operations or client activity.

29.     When asked for information regarding Dr. Mercola's account, Defendant became evasive.

30.     Dr. Mercola directed his counsel to engage with Defendant to secure the return of his digital assets.

31.     From November 1, 2024 until November 6, 2024, Dr. Mercola and Dr. Mercola's counsel engaged in repeated efforts to contact Defendant and recover Dr. Mercola's assets, via email, telephone conversations, text messages, and a Zoom call.

32.     During the Zoom call, Defendant claimed that there were "difficulties" and that there would be "catastrophic" consequences associated with any "early withdrawal."

33.     On or about November 18, 2024, Dr. Mercola received a message from Defendant stating that Dr. Mercola's assets would need to be "wound down" to avoid potential losses.

34.     Defendant assured Dr. Mercola that a wind-down order was initiated on November 15, 2024 and would be completed, with Dr. Mercola's account closed out and the full balance

transferred back to Dr. Mercola, by February 14, 2025.

35.    Dr. Mercola responded by instructing Defendant to promptly return 90% of his crypto assets and that the decision to withdraw the assets was Dr. Mercola's decision, regardless of any potential losses.

36.    On or about November 18, 2024, Defendant sent a voice message to Dr. Mercola repeating his prior plan without addressing any of the specific questions previously raised by Dr. Mercola.

37.    Dr. Mercola repeated his demand to return his crypto assets without further delay, along with a full accounting.

38.    Defendant claimed that a portion of Dr. Mercola's assets were subject to a holding period and claimed that an early withdrawal would result in "catastrophic" penalties, without specificity.

39.    Defendant claimed that he did not posses specific details regarding individual transactions because he was trading the assets in his possession on 15 different exchanges at the same time.

40.    Defendant again promised that Dr. Mercola's assets would be returned in full by February 14, 2025.

41.    On or about November 19, 2024, Defendant sent another message, stating he would continue winding down the account to ensure it would "settle in its totality."

42.    Defendant assured Dr. Mercola that his assets were secure and generating profits and stated that he would provide an account statement the following Monday.

43.    Defendant ignored Dr. Mercola's repeated demands that his crypto assets be returned without further delay and instead maintained that his remaining balance would be returned

by February 14, 2025 because doing otherwise would be catastrophic.

44.    Dr. Mercola continued to press Defendant.

45.    On or about November 20, 2024, Dr. Mercola informed Defendant that there was no need for further discussion, as he had already issued clear instructions for the immediate return of his cryptocurrency assets.

46.    Despite Dr. Mercola's repeated instructions and growing urgency, Defendant continued to delay, avoid direct answers, and shift explanations.

47.    On or about November 25, 2024, Defendant responded by denying that he was refusing to comply.

48.    Defendant reiterated that Dr. Mercola's assets would be returned in full on February 14, 2025.

49.    Defendant claimed that any early withdrawal could result in losses exceeding 60%, claiming his system could not process an early release without damaging the balance.

50.    In a voice message, Defendant stated that the crypto assets were being traded across hundreds of assets globally and that he needed time to "wind down the trade without breaking it" and ensure both the return of principal and profits.

51.    On or about November 26, 2024, Dr. Mercola received a partial statement from Defendant that lacked critical information, including any record of trades or transactional activity.

52.    Dr. Mercola promptly sent a message pointing out these deficiencies.

53.    On or about November 27, 2024, Defendant responded by stating that he does not provide detailed transaction-level data.

54.    Defendant stated that the platform engages in high-frequency trading across multiple exchanges, executing tens of thousands of trades per hour, and therefore furnishing such

data was neither practical nor feasible.

55.    On or about December 3, 2024, Dr. Mercola received a message from Defendant, indicating that a small amount of Bitcoin ("BTC") had been transferred to him, with additional amounts to be transferred as the close-out date approaches.

56.    Defendant sent Dr. Mercola a link to the BTC transaction confirmation which showed he transferred 0.137 BTC.

57.    That transfer was not as Dr. Mercola directed, and represented a small amount of Dr. Mercola's holdings.

58.    Since mid-December, Defendant has declined to respond to any of Dr. Mercola's communications or communications made on Dr. Mercola's behalf, and Dr. Mercola has not heard from Defendant or anyone from Defendant's firm.

59.    Mr. Singleton has provided no additional support to Dr. Mercola for the return of Dr. Mercola's crypto assets.

60.    The date of February 14, 2025 came and passed, without Defendant's return of Dr. Mercola's crypto assets.

61.    After this date passed, Dr. Mercola decided to pursue civil legal remedies to recover his assets.

62.    Dr. Mercola was materially misled and fraudulently induced into transferring digital assets based upon Defendant's false representations regarding the security, location, and handling of his investments.

63.    Defendant has declined to return Plaintiff's investment. Instead, Defendant has provided inconsistent and evasive explanations, including that the funds were subject to a holding period, that external compliance procedures were delaying access, and that the money would be

returned in the coming months.

64.     These claims were entirely baseless and intended to stall further inquiry into the fraudulent nature of the scheme. Despite the passage of several months, no funds have been returned, and Defendant has ceased any meaningful communication with Plaintiff.

65.     On or about March 4, 2025, following Defendant's failure to provide any transparent information or initiate a return of funds, Plaintiff's counsel engaged a forensic investigator to trace the disposition of the transferred assets and determine whether the funds had been fraudulently diverted.

66.     The investigation revealed Defendant's aforementioned history of fraudulent activity and misrepresentation in connection with unregistered financial services and crypto-based investment schemes.

67.     A forensic blockchain tracing report confirmed that Plaintiff's 4,553.5 ETH had been dissipated through multiple wallets and laundered through cryptocurrency exchanges including FTX, OKX, FalconX, Bybit, FortressTrust.com, and Kraken.

68.     Despite repeated efforts by Plaintiff and his legal team, Defendant has refused to return any portion of the misappropriated funds, has declined to provide a credible explanation, and refuses to disclose the current location of the assets.

69.     Plaintiff has not recovered any portion of the converted ETH and has been denied access or information regarding its disposition.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Commodities Fraud – Commodity Exchange Act)

70.     Plaintiff realleges and incorporates by reference all preceding paragraphs as thought fully set forth herein.

71.     The cryptocurrency Ethereum is a commodity subject to regulation by the Commodity Exchange Act ("CEA"). *See Commodity Futures Trading Comm'n v. Ikkurty*, No. 22-CV-02465, 2024 WL 3251348, at *4, 5 (N.D. Ill. July 1, 2024) (collecting cases and summarizing applicability of CEA to Ethereum) (sustaining plaintiff's cause of action that "Defendants defrauded fund participants by making material misrepresentations and/or misappropriating customer funds").

72.     The CEA permits a private right to action for fraud in violation of the CEA. *See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 387 (1982); *see also* 7 U.S.C § 25.

73.     7 U.S.C. § 6b governs "Contracts designed to defraud or mislead." Liability attaches under 7 U.S.C. § 6b(a) when there is "(1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality." *Commodity Futures Trading Comm'n v. JBW Cap.*, 812 F.3d 98, 106 (1st Cir. 2016) (quoting *CFTC v. Hunter Wise Commodities*, LLC, 749 F.3d 967, 981 (11th Cir. 2014)).

74.     Misrepresentations can include, but are not limited to, historic performance, plans about the future distributions of profits, investment methodology (or lack thereof), and the investor's background and experience. *See Commodity Futures Trading Comm'n v. Ikkurty*, No. 22-CV-02465, 2024 WL 3251348, at *6 (N.D. Ill. July 1, 2024). Moreover, "[a]ctionable misrepresentations include those made to persons when soliciting funds." *JBW Cap.*, 812 F.3d at 109 (1st Cir. 2016) (citing *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 110–11 (2d Cir. 1986); *Hirk v. Agri–Research Council, Inc.*, 561 F.2d 96, 103–04 (7th Cir. 1977)).

75.     To prove scienter, a plaintiff must show that Defendants acted intentionally or recklessly. *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002)) (discussing

scienter in the context of 7 U.S.C. § 6b claims, which apply the same standard); *see also CFTC v. Kraft Foods Grp., Inc.*, 153 F.Supp.3d 996, 1007 (N.D. Ill. 2015) (discussing scienter in the context of fraud claims under Section 10(b) of the Exchange Act and adopting standard for analogous CEA provisions). Scienter can also be established by proof of "highly unreasonable omissions or misrepresentations that present a danger of misleading [customers] which is either known to the Defendant or so obvious that Defendant must have been aware of it." *R.J. Fitzgerald,* 310 F.3d at 1328 (cleaned up).

76. A statement or omission is material "if there is a substantial likelihood that a reasonable [investor] would consider it important" in making an investment decision. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

77. Plaintiff can show all three elements are met under 7 U.S.C. § 6b(a). Defendant made clear demonstrably false statements as to his credentials, his past experiences, and his connections.

78. Plaintiff can show that Defendant intentionally made such misrepresentations to Dr. Mercola with the intent to induce Dr. Mercola into believing that the crypto assets would be invested, handing over control of his crypto assets, and that Defendant would receive a portion of the profits in return for his services. It is evident that Defendant did not actually intend to conduct his promised actions, or at minimum, it is evident that Defendant knew that he would not be able to. Instead, Defendant failed to conduct any of the actions that he represented to Dr. Mercola, was actually unable invest the assets, and by all appearances, has instead simply attempted to take Dr. Mercola's considerable crypto assets for himself.

79. Plaintiff has suffered direct financial harm as a result of Defendant's fraudulent actions, and is accordingly entitled to restitution, including in the form of return of his crypto and

financial compensation. *See* 7 U.S.C. § 25; *see also Commodity Futures Trading Comm'n v. Jafia LLC*, No. 22-CV-2465, 2024 WL 4609090, at *3 (N.D. Ill. July 22, 2024) (final judgment order granting among other remedies, restitution, disgorgement, and contempt penalties).

**SECOND CAUSE OF ACTION**
**(Securities Fraud)**

80.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

81.     Private plaintiffs are permitted to bring private action seeking damages under the anti-fraud provisions of the federal securities law. *See, e.g., Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 735 (1975); *see also Garrison v. Ringgold*, No. 19CV244-GPC(RBB), 2019 WL 2089509, at *7 (S.D. Cal. May 13, 2019).

82.     Judges in the Southern District of New York have affirmed that certain investment schemes involving crypto assets are covered by securities law.  *See United States v. Mashinsky*, No. 23-CR-347 (JGK), 2024 WL 4728500, at *4 (S.D.N.Y. Nov. 8, 2024) (collecting cases).

83.     In the alternative to Ethereum's status as a commodity, Ethereum likely qualifies as a security under the *Howey* test. *See SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). Under *Howey*, an investment contract refers to a "contract, transaction or scheme" in which a person makes: (1) an investment of money, (2) in a common enterprise, (3) with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. 328 U.S. at 298–99; *see also SEC v. Edwards*, 540 U.S. 389, 393 (2004). In analyzing whether a contract, transaction, or scheme is an investment contract, "form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967). Ethereum meets all four elements. Moreover, the SEC has recently indicated a return to classifying Ethereum as a security, rather than a commodity. Maria Gracia Santillana Linares, *SEC Chairman*

*Gary Gensler Implies that Ether is a Security and Falls under His Jurisdiction*, FORBES (June 27, 2022, 6:22 PM), https://www.forbes.com/sites/mariagraciasantillanalinares/2022/06/27/sec-chairman-gary-gensler-implies-that-ether-is-a-security-and-falls-under-his-jurisdiction/.

84.    Section 10(b) of the Securities Exchange Act makes it unlawful for "any person ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or ... for the protection of investors." 15 U.S.C. § 78j(b).

85.    Rule 10b–5 implements this provision by making it unlawful to "make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, ...." 17 C.F.R. § 240.10b–5(b). Rule 10b-5 also makes it unlawful for any person "[t]o employ any device, scheme, or artifice to defraud" or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5(a), (c).

86.    To state a securities fraud claim under § 10(b) of the Act and Rule 10b–5, a plaintiff must show (1) a material misrepresentation or omission, (2) scienter, (3) in connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011).

87.    Dr. Mercola satisfies each of the elements necessary to succeed in his complaint. Defendant made repeated material misrepresentations including that Defendant was a high-level financial insider with institutional trading experience, promising to invest and grow Dr. Mercola's assets. Defendant also omitted facts, including his history of promoting fraudulent MLM schemes,

and a lack of any professional experience in managing investments.

88.    Defendant made these misrepresentations and omissions knowingly and with the intent to abscond with Dr. Mercola's crypto assets and take them for his own. Defendant had exclusive control over the wallets receiving Plaintiff's funds and orchestrated a complex movement of assets through various exchanges without Plaintiff's authorization or awareness, further demonstrating an intent to deceive.

89.    Moreover, Defendant's misrepresentations were made in connection with the purpose or sale of securities. Plaintiff invested in digital assets in what he was led to believe was an investment vehicle offering structured returns managed by an experienced professional.

90.    Plaintiff reasonably and justifiably relied on Defendant's misrepresentations, and transferred over $14 million worth of cryptocurrency assets into Defendant's control. Plaintiff would not have entered into any transaction or entrusted his funds had the true nature of Defendant's experience, intent, or lack of compliance been disclosed.

91.    Dr. Mercola has incurred economic harm as a direct result of Defendant's actions. Defendant refuses to return Dr. Mercola's investment and has refused to identify the location of Dr. Mercola's assets. Accordingly, Dr. Mercola has incurred over $14 million in loss as a direct result of Defendant's fraudulent actions.

## THIRD CAUSE OF ACTION
### (Fraud-NY Law)

92.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

93.    To allege a cause of action based on fraud under New York state law, a plaintiff must assert "a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable

reliance of the other party on the misrepresentation or material omission, and injury." *Connaughton v. Chipotle Mexican Grill, Inc*., 75 N.E.3d 1159, 1163 (N.Y. 2017) (*citing* Lama *Holding Co. v. Smith Barney*, 668 N.E.2d 1370, 1373 (N.Y. 1996)).

94.    Defendant made numerous misstatements of material fact, including that Defendant was a high-level financial insider with experience at major financial institutions, and that Plaintiff's funds would be safely invested in legitimate asset protection strategies.

95.    These statements were false, as Defendant had no such credentials, and the investment vehicles were not legitimate.

96.    Defendant knew these statements were false, or at a minimum acted recklessly with regard to their truth, as evidenced by Defendant's prior fraudulent ventures.

97.    Defendant made these statements with the intent that Plaintiff rely upon them when deciding to transfer funds to Defendant's control.

98.    Plaintiff's reliance on Defendant's statements was justifiable, and Plaintiff did in fact rely upon these statements in making the decision to invest $14 million through Defendant.

99.    Plaintiff was directly harmed as a result of Defendant's fraudulent statements and continues to suffer harm as a result of this conduct and sustained financial losses exceeding $14 million.

### FOURTH CAUSE OF ACTION
### (Fraudulent Inducement – NY Law)

100.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

101.    To allege a cause of action based on fraudulent inducement under New York state law, a "plaintiff must allege facts to support the claim that it justifiably relied on the alleged misrepresentations." *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 106 N.E.3d 1176

(N.Y. 2018) (*citing ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*, 32 N.E.3d 921 (N.Y. 2015)).

102.    Defendant falsely claimed to be an experienced, high-level financial professional, with insider access to private investment opportunities and affiliations with major financial institutions.

103.    Defendant was fully aware that these representations were false or misleading, and made them with reckless disregard for the truth.

104.    Defendant made these false statements with the intent that Plaintiff would rely on them and transfer substantial digital assets into their control.

105.    Plaintiff justifiably relied on Defendant's representations based on his authoritative presentation and consistent communications.

106.    As a direct result of Plaintiff's reliance on Defendant's false statements, Plaintiff suffered a loss of approximately 4,553.5 ETH, valued at over $14 million at the time of the transfer.

**FIFTH CAUSE OF ACTION**
**(Breach of Implied-in-Fact Contract – NY Law)**

107.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

108.    Plaintiff and Defendant engaged in a course of conduct whereby Defendant was to provide asset management and investment services in exchange for consideration.

109.    This claim is based on a breach of a contract implied-in-law recognized under New York state law. *See State of New York v. Barclays Bank*, 563 N.E.2d 11 (N.Y. 1990); *Parsa v. State of New York*, 474 N.E.2d 235 (N.Y. 1984). As the New York Court of Appeals has explained, the law recognizes such a cause of action "in the absence of an agreement when one party possesses money that in equity and good conscience [it] ought not to retain and that belongs to another." *Miller v. Schloss*, 218 N.Y. 400, 406–407 The cause of action permits a plaintiff to recover money

which has come into the hands of the defendant "impressed with a species of trust." *Chapman v. Forbes*, 123 N.Y. 532, 537. Such circumstances lead to cases where it is "'against good conscience for the defendant to keep the money.'" *Federal Ins. Co. v. Groveland State Bank*, 37 N.Y. 2d 252, 258 (*quoting Schank v. Schuchman*, 212 N.Y. 352, 358

110. Plaintiff fulfilled his obligations to the implied contract by transferring funds.

111. Defendant breached his obligations under this implied contract by failing to provide the promised services and by misappropriating funds.

112. As a direct and proximate result of Defendant's breach, Plaintiff has suffered financial harm, including but not limited to the loss of the cryptocurrency and any potential gains.

## SIXTH CAUSE OF ACTION
### (Conversion – NY Law)

113. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

114. A plaintiff states a claim for conversion under New York state law when a defendant, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession. *Colavito v New York Organ Donor Network, Inc.*, 860 N.E.2d 713 (N.Y. 2006); *Abraham v Torati*, 219 A.D.3d 1275, (2d Dep't 2023); *Cretaro v Huntington*, 203 A.D.3d 1696 (4th Dep't 2022); *Halvatzis v Perrone*, 199 A.D.3d 785 (2d Dep't 2021); *Reif v Nagy*, 175 A.D.3d 107 (1st Dep't 2019).

115. Plaintiff transferred digital assets — specifically 4,553.5 ETH — to wallets under Defendant's control based on the explicit and limited purpose of investment management.

116. Plaintiff did not authorize Defendant to use, transfer, or dissipate the assets for any personal, undisclosed, or non-investment-related purpose.

117.    Defendant intentionally exercised unauthorized control over the ETH by transferring it through intermediary wallets, converting and dissipating portions of the ETH across multiple cryptocurrency exchanges, and failing to return the funds when formally requested by Plaintiff.

118.    Defendant has declined to return the assets to Plaintiff, has declined to provide any justification as to why Defendant continues to hold Plaintiff's assets, and has declined to inform Plaintiff of the location of the Ethereum.

119.    As a result of Defendant's conversion, Plaintiff has been deprived of his right to possess and access his digital assets, for which Plaintiff continues to suffer harm.

## SEVENTH CAUSE OF ACTION
### (Breach of Fiduciary Duty – NY Law)

120.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

121.    To state a claim for a breach of fiduciary duty under New York law, "a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct." *Kurtzman v. Bergstol*, 40 A.D.3d 588, 590 (2nd Dep't 2007); *see also Pokoik v. Pokoik*, 115 A.D.3d 428 (1st Dep't 2014).

122.    Under New York law, "a fiduciary relationship embraces not only those the law has long adopted—such as trustee and beneficiary—but also more informal relationships where it can be readily seen that one party reasonably trusted another." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150-51 (2d Cir. 1993); *see also Felice v. Westpark Cap., Inc.*, No. 23-CV-10138 (JPO), 2024 WL 4349482 (S.D.N.Y. Sept. 30, 2024) (finding broker fiduciary relationship despite no formal contract).

123.    Defendant undertook to provide Plaintiff with specialized financial advice and

investment management services, purporting to safeguard Plaintiff's assets through secure and sophisticated strategies involving cryptocurrency and alternative assets such as gold.

124.    Plaintiff reposed significant trust and confidence in Defendant, based on their self-proclaimed expertise and representations that they would act in Plaintiff's best interest.

125.    This relationship created a fiduciary duty, as Defendant was entrusted with control over Plaintiff's digital assets and promised to act as stewards of Plaintiff's capital.

126.    Defendant breached his fiduciary obligations by misrepresenting his professional qualifications, failing to act in Plaintiff's best interest, misappropriating Plaintiff's funds and using them for unauthorized purposes, and failing to return the assets upon request.

127.    As a direct result of Defendant's breach of fiduciary duty, Plaintiff has suffered significant financial harm, including the loss of approximately 4,553.5 ETH.

## EIGHTH CAUSE OF ACTION
### (Unjust Enrichment – NY Law)

128.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

129.    To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that "equity and good conscience" require restitution. *See Dolmetta v. Uintah Nat'l Corp.,* 712 F.2d 15, 20 (2d Cir. 1983). The "essence" of such a claim "is that one party has received money or a benefit at the expense of another." *City of Syracuse v. R.A.C. Holding, Inc.,* 258 A.D.2d 905, 685 N.Y.S.2d 381, 381 (4th Dep't 1999).

130.    Defendant received approximately 4,553.5 ETH from Plaintiff, which was transferred in reliance on Defendant's promises of investment management.

131.    The assets were transferred solely due to Plaintiff's efforts, investment, and reliance

on Defendant's representations, not due to any legitimate services rendered.

132.    Defendant failed to provide the promised services, made misrepresentations to induce the transfer, and refused to return the funds despite multiple requests. Plaintiff has suffered clear and direct financial harm. Under these circumstances, it is unjust and inequitable to permit Defendant to retain the benefit of Plaintiff's assets.

## NINTH CAUSE OF ACTION
### (Promissory Estoppel)

133.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

134.    Defendant made clear and unambiguous promises to Plaintiff, including but not limited to:

   a.   That he would invest Plaintiff's assets in a legitimate, secure, and professionally managed portfolio of cryptocurrency and precious metals;

   b.   That Defendant was a financial professional acting in Plaintiff's best interests; and

   c.   That the funds would be safeguarded and returned upon request.

135.    Defendant made these promises with the intent that Plaintiff would rely on them in deciding to transfer substantial assets to Defendant's control.

136.    Plaintiff reasonably and foreseeably relied on these promises by transferring approximately 4,553.5 ETH, valued at approximately $14 million, to wallets and accounts controlled by Defendant.

137.    As a direct result of this reliance, Plaintiff suffered significant financial loss, including the loss of the full value of his transferred assets.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, respectfully requests that the Court:

1.     Award Plaintiff such temporary and preliminary injunctive relief as may be necessary to avert the likelihood of further injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to temporary and preliminary injunctions, an *ex parte* temporary restraining order temporarily freezing Defendant's digital assets, including but not limited to the cryptocurrency exchanges and wallets identified in ¶ 18 of this Verified Complaint, to prevent the immediate and irreparable injury, loss, and damage that will result to Plaintiff;

2.     Award such relief as the Court deems just and proper to redress injury resulting from Defendant's violations, including but not limited to, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

3.     Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.


Dated: April 25, 2025                    **NIXON PEABODY LLP**


By: _____
        Daniel J. Hurteau

677 Broadway, 10th Floor
Albany, NY 12207
Tel.: (518) 427-2650
dhurteau@nixonpeabody.com

*Attorneys for Plaintiff Dr. Joseph Mercola, DO*

**FEDERAL PRACTICE GROUP**

By: _/s/ Eric S. Montalvo_____

      Eric S. Montalvo
(*Pro Hac Vice* Forthcoming)

801 17th Street, Suite 250
Washington, DC 20006
Tel.: (202) 862-4360
emontalvo@fedpractice.com

*Attorneys for Plaintiff Dr. Joseph Mercola, DO*

**<u>VERIFICATION</u>**

I, Dr. Joseph Mercola, DO, am the Plaintiff in the case captioned Dr. Joseph Mercola, DO v. Viji Varghese and have authorized the filing of this Complaint. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe them to be true. As to those allegations of which I do not have personal knowledge, I rely on the documents, communications, and records referenced herein and I believe them to be true.

Signed under the penalties of perjury this <u>25th</u> day of April, 2025.


_____
Dr. Joseph Mercola, DO